Jeena Jiampetti, SB#251075
Email: jeena@benefitslaw.com
Cassie Springer Ayeni, SB# 221506
Email: cassie@benefitslaw.com
**SPRINGER AYENI,**
**A Professional Law Corporation**
123 Estudillo Avenue, Suite 201
San Leandro, CA 94577-4701
Telephone:  510.926.6768
Facsimile:  1.510.926.6768

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### Oakland / San Francisco Division

| | |
|---|---|
| VALERIE LELAND,<br><br>Plaintiff,<br>vs.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>Defendant. | Case No. 4:22-cv-0835<br><br>**COMPLAINT (ERISA)** |

### <u>JURISDICTION AND VENUE</u>

1.      Plaintiff Valerie Leland ("Ms. Leland or "Plaintiff") brings this action for declaratory, injunctive, and monetary relief pursuant to §§ 502(a)(1)(B) and 502(g) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B); 1132(a)(g).  This Court has subject matter jurisdiction over Plaintiff's claim under 29 U.S.C. § 1132(e), (f), (g), as it involves a claim by Plaintiff for disability benefits under an employee benefit plan regulated and governed by ERISA.  Jurisdiction is predicated under these code sections as well as 28 U.S.C. §1331, as this action involves a federal question.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.      At all relevant times, Ms. Leland was a participant, as defined by 29 U.S.C. § 1002(7), in the employee benefit plan ("the Plan") sponsored by her employer. Hartford Life and Accident Insurance Company ("Hartford" or "Defendant") insured and administered a long-term disability (LTD) policy that is part of the Plan.

3.      Plaintiff is informed and believes that Defendant is, and at all times herein mentioned has been, licensed to do business in California.

4.      Venue is proper under 29 USC § 1132(e)(2) (special venue rules in ERISA actions) because Defendant can be found in this District, does business in this District, and/or has employees in this District.

## INTRADISTRICT ASSIGNMENT

5.      The Oakland Division or the San Francisco Division of this judicial district would be the appropriately assigned division, pursuant to Civil L.R. 3-2(d), as Defendant may be found in these divisions, does business in these Divisions, and/or has employees in these Divisions.

## PARTIES

6.      Prior to going out on disability leave in or around 2018, Ms. Leland worked as a production attorney for Warner Media, LLC.

7.      At Warner, Ms. Leland participated in her company's ERISA benefits plans, including long-term disability ("LTD") policy number GLT402359 (the "Policy"), which is sponsored by Warner and insured and administered by Defendant.

8.      At all relevant times, Ms. Leland was and is a participant in the ERISA plans, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

9.      At all relevant times, Defendant exercised discretionary authority or discretionary control with respect to management of the Policy and/or had discretionary authority or discretionary responsibility in the administration of the Policy.

10.     At all relevant times, Defendant was and is a fiduciary of the Plan as defined by ERISA § 3(21), 29 U.S.C. § 1001(21).

## FACTS

11.     Ms. Leland worked as a production attorney for Turner Broadcasting System ("Turner"), a division of Warner Media, from 2016 to 2018.  Her job at Turner was only her second job in the legal field following her 2014 graduation from law school.

12.     At Turner, Ms. Leland's primary job responsibility was to negotiate contracts for the TNT and TBS networks.  In this capacity, she worked almost exclusively—approximately 6-7 hours per day—on the computer drafting email correspondence, redlining contracts (some over 30 pages), commenting on contracts, calendaring multiple deadlines, accessing a database with contract templates, drafting contracts, and using software to compare difference versions of contracts.  Ms. Leland also supervised IP clearance, advised the company on guild issues (such as the Screen Actors Guild, Writers Guild of America, Directors Guild of America) to ensure that the company stayed within all guild regulations, and advised producers and other company executives on various legal issues, such as employment issues.

13.     In a sworn declaration, Ms. Leland described her job as "fast-paced and hard work, demanding a lot of quick thinking on [her] feet."

14.     The Production Attorney Job Description from Turner confirms Ms. Leland's account of her essential job functions:

> Primary job responsibilities include drafting or reviewing and negotiating a high volume of production (and post production) related agreements, including vendor, location, special effects, termination, turnaround, assignment and indemnity agreements, material releases, work-for-hire certificates, clip licenses, crew deal memos, upset price agreements and contracts for services of series staff writers and episodic writers/directors; conducting chain of title and rights analysis; preparing and updating rights and contract summaries and filing financial statements…

> • Successful candidate must be able to analyze agreements and fact patterns both for current and potential legal issues and effectively communicate any risks with stakeholders.
> • Exceptional interpersonal, analytical and organizational skills, attention to detail, and the ability to manage attorney and client demands appropriately while working in a fast-paced environment where deadlines are a priority and handling multiple projects simultaneously is the norm.

15.     On or around August 15, 2018, Ms. Leland became disabled by mental

health conditions and stopped working at Turner.

16.    Ms. Leland subsequently applied for LTD benefits and Defendant initially denied her claim.  Through counsel, she filed an appeal and Defendant reversed its decision, approving LTD benefits effective February 13, 2019.  Under the LTD policy, the maximum benefit period for mental health claims is 24 months, or in Ms. Leland's case, until February 12, 2021.

17.    In or around October 2019, while still out on disability for her mental health conditions, Ms. Leland went to the emergency room with what she thought was a broken wrist.  She had been suffering from pain and swelling in her left wrist that was not alleviated with rest, ice, over-the-counter pain medication, or a wrist brace.  The hospital informed Ms. Leland to see a specialist.

18.    In or around December 2019, Ms. Leland saw of number of treatment providers who noted high levels of pain, swelling, tenderness, and limited range of motion.

19.    An orthopedic surgeon Ms. Leland saw at the end of the December 2019 reviewed MRI results of Ms. Leland's left wrist and diagnosed her with Kienbock's disease.

20.    On information and belief, Kienbock's disease is a rare condition where the blood supply to one of the small bones in the wrist (lunate bone) is interrupted and can lead to bone death and permanent damage to the wrist.  There is no definitive cause of Kienbock's disease, but risk factors include prior trauma to the wrist or anatomical abnormalities of the blood vessels or forearm bones.

21.    On information and belief, there are four stages of severity to Kienbock's disease and at the time of her diagnosis in December 2019, Ms. Leland's disease progression was a stage 3A.

22.    On information and belief, in stage 3, the lunate bone has hardened due to a lack of blood supply and it begins to collapse and break apart and may cause surrounding bones to shift.  Symptoms in stage 3 typically include increased pain, grip

weakness, and limited range of wrist motion.

23.     On information and belief, there is no cure for Kienbock's disease and treatment is focused on pain relief and preserving wrist function for as long as possible, rather than restoration of wrist function.  In later stages, surgery may be an option but procedures are limited by the progression of the disease and the surgeon's experience.

24.     When Ms. Leland received her Kienbock's diagnosis, the orthopedic surgeon suggested surgery, but Ms. Leland delayed treatment to focus on her disabling mental health conditions and critical family obligations, including treatment and monitoring of her son's seizures that resulted in brain surgery, the wrongful death lawsuit for her mother that required frequent out-of-state travel, and the care of her aging grandmother.  She was also without health insurance for a period of time.

25.     Beginning in December 2019, Ms. Leland's Kienbock's disease and disabling symptoms were documented in psychotherapy records and forms submitted to Defendant as part of the administration of Ms. Leland's mental health claim.

26.      On or about October 20, 2020, Ms. Leland asked Defendant to find her disabled as a result of her Kienbock's disease and extend LTD benefits beyond February 12, 2020.  In support of this request, Ms. Leland enclosed medical records, MRI results, a sworn declaration, and medical literature regarding Kienbock's disease.

27.     In the sworn declaration, Ms. Leland described how constant pain and a limited range of motion in her wrist interferes with her ability to perform basic activities of daily living like washing dishes, buttoning a shirt, or lifting anything more than a few pounds.  She also explained that the pain limits her ability to sleep, concentrate, and regulate her emotional reactions.

28.     The declaration also noted that she wears a wrist brace at all times, except when showering, and that she is experiencing pain in her right wrist, possibly due to overuse or the development of Kienbock's disease in an additional location.

29.     Upon receipt of her October 20, 2020 letter, Defendant requested that Ms. Leland submit updated medical records and have her doctor complete an Attending

1

Physician Statement (APS).

2

30.     The November 24, 2020 APS completed by Ms. Leland's doctor confirmed

3

her Kienbock's disease diagnosis and noted that she suffers from left wrist pain,

4

intermittent swelling of the wrist, and a limited range of motion, and has difficulty

5

completing activities of daily living without pain.

6

31.     The APS also documented Ms. Leland's restrictions and limitations: a total

7

of 0 to 2.5 hours each day ("occasionally") of driving and left-handed fine manipulation,

8

gross manipulation, and reaching, as permitted by pain.  These restrictions and

9

limitations were identified as "ongoing" and her expected return to work date was listed

10

as "N/A."

11

32.     As part of its review of whether Ms. Leland was entitled to ongoing benefits

12

due to her Kienbock's disease, Defendant's internal nurse performed a clinical

13

assessment of Ms. Leland's medical records.  The assessment conceded that there was

14

medical documentation supporting her Kienbock's disease diagnosis and the resulting

15

restrictions and limitations imposed by her doctor.  It listed her prognosis for

16

improvement as "guarded."

17

33.     Defendant also sent Ms. Leland's claim to a vocational case manager to

18

generate an employability analysis report ("EAR") and opine on Ms. Leland's

19

employability taking into account her functional capacity, education, work history, and the

20

earnings requirement under the LTD policy.  The vocational assessment performed by

21

Defendant's case manager involved consulting a job-matching system that cross-

22

referenced Ms. Leland's qualifications with occupations listed in the U.S. Department of

23

Labor's 1991 Dictionary of Occupational Titles (DOT).  Defendant also contracted with a

24

third-party to conduct a labor market "survey" that amounted to cold calling-several

25

employers with open job requisitions.

26

34.     The DOT, which served as the foundation of Defendant's EAR, has not

27

been updated since the emergence of personal computers and publicly-available

28

internet, and was replaced in 2001 by an occupation classification system called O*NET.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

35.     According to the deficient EAR, which did not consider contemporary work requirements, there are four occupations that Ms. Leland can perform full time: corporate lawyer, patent lawyer, adjudicator, and contract clerk.

36.     As with the vocational assessment, the labor market survey was poorly constructed.  Many of the "employers" surveyed were actually staffing agencies that were unfamiliar with the day-to-day duties of the open positions.  Even when legitimate employers were contacted, the individuals surveyed were administrative or sales associates who also lack sufficient knowledge of job requirements.

37.     The survey additionally failed to consider that Ms. Leland was not qualified for the majority of the positions surveyed because she was not admitted to practice law in the states where those jobs were located and she had never practiced patent law.

38.     Most significantly, the surveyors did not disclose the true nature of Ms. Leland's restrictions and limitations when they simply asked survey participants whether the jobs identified would permit "occasional" use of the non-dominant upper extremity. The relevant question should have been: Is a candidate still qualified if she is prevented from performing fine manipulation, such as keyboarding and mousing, for more than 20 minutes at a time, and up to a maximum of 2.5 hours in an 8-hour day, every work day?

39.     Using the flawed EAR as a justification not to extend LTD benefits, Defendant informed Ms. Leland via a letter dated February 2, 2021, that no LTD benefits were payable for to her physical condition and that all LTD benefits for her mental health conditions would terminate on February 12, 2021.

40.     Through counsel, on or about September 30, 2021, Ms. Leland appealed the termination of her LTD benefits.  Ms. Leland's appeal included an updated sworn declaration and a detailed rebuttal to Defendant's EAR.  Since Defendant's EAR was inadequate, Ms. Leland also obtained and submitted her own vocational analysis report prepared by the Center for Career Evaluations (now known as "CORE").

41.     Ms. Leland's updated declaration described her production attorney job duties at Turner and stated that she can no longer work 6-7 hours at a computer like she

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

had been doing at Turner.  According to Ms. Leland, she can work on the computer for only about 20 minutes before she needs to take an extended break.

42.    The vocational analysis by CORE concluded that there are no occupations that Ms. Leland can perform that would meet the Policy's income requirement because all occupations for which she is qualified would require more than 0-2.5 hours of daily computer/desk work.  CORE's evaluation was based on a review of Ms. Leland's sworn statements, Ms. Leland's medical records, Defendant's clinical assessment, Defendant's EAR and labor market survey, Ms. Leland's job description, and a review of the O*NET database.

43.    CORE's assessment also criticized Defendant's use of the outdated DOT and the flawed methods utilized in the labor market survey.

44.    Upon receipt of Ms. Leland's appeal, Defendant requested an addendum to the original EAR in order to address the findings of CORE's vocational assessment and the arguments of Ms. Leland's counsel.

45.    On or about October 19, 2021, Defendant's vocational case manager issued an EAR addendum purporting to assess Ms. Leland's capacity for gainful employment using O*NET.  According to the EAR addendum, the occupations identified in the original EAR were "still viable."

46.    A copy of the EAR addendum was provided to Ms. Leland's counsel on or about October 25, 2021.  Ms. Leland's counsel responded to the EAR addendum on or about November 10, 2021.

47.    Ms. Leland's rebuttal to the EAR addendum noted that the addendum failed to address many of the issues identified in Ms. Leland's appeal and continued to ignore the actual occupational duties for any legal positions for which Ms. Leland would be qualified.

48.    On or about November 19, 2021, Defendant issued denial of Ms. Leland's appeal.  The denial letter stated Defendant was not "disputing that computers are of importance to the occupations identified" but rejected the contention that legal

professionals use computers for nearly every activity, or at least frequently.

49.     Having exhausted all administrative remedies, this lawsuit followed.

### POLICY TERMS

50.     Under the terms of the LTD policy, "Disability" or "Disabled" means the claimant is prevent from performing one or more of the essential duties of their occupation during the elimination period and for the first 24 months following the elimination period, and as result, their current monthly earnings are less than 80% of their indexed pre-disability earnings, as defined by the Policy.

51.     After the first 24 months, the claimant must be prevented from preforming one or more of the essential duties of any occupation.  Under the terms of the Policy, "any occupation" means any occupation for which the claimant is qualified by education, training, or experience, and has an earnings potential which is greater than the lesser of the maximum monthly benefit or the product of the claimant's indexed pre-disability earnings and 80%, as defined by the Policy.

52.     The LTD Policy defines essential duty as a duty that is substantial, not incidental; is fundamental or inherent to the occupation; and cannot be reasonably omitted or changed.  Under the terms of the Policy, the ability of a claimant to work the number of hours in hours in their regularly scheduled work week is an "essential duty."

53.     The LTD policy limits the benefit period for mental illness, substance abuse, and self-reported symptoms to 24 months.

54.     Under the terms of the LTD policy, Ms. Leland's LTD benefits are 60% of her pre-disability earnings, less applicable offsets, as defined by the Policy.

### COUNT I
### [Claim for Benefits Pursuant to ERISA § 502(a)(1)(B)]

55.     Plaintiff incorporates Paragraphs 1 through 54 as though fully set forth herein.

56.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due under the terms of a plan, to enforce rights

under the terms of a plan, and/or to clarify rights to future benefits under the terms of a plan.

57.    At all relevant times, Plaintiff has been disabled and entitled to disability benefits under the terms of the LTD policy.  By terminating Plaintiff's claim for LTD benefits, and by related acts and omissions, Defendant has violated, and continues to violate, Plaintiff's right to benefits under the Plan.

## **PRAYER FOR RELIEF**

 WHEREFORE, Plaintiff prays that the Court grant the following relief:

A.    Declare that Defendant violated the terms of the Policy by terminating Plaintiff's claim for LTD benefits;

B.    Order Defendant to pay LTD benefits to Plaintiff pursuant to the terms of the Policy, together with prejudgment interest on each and every such payment through the date judgment is entered herein;

C.    Declare Plaintiff's right to reinstatement under the LTD Policy, and the right to receive future LTD benefits pursuant to the terms of the Policy for as long as Plaintiff remains disabled under the terms of the Policy;

D.    Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and,

E.    Provide such other relief as the Court deems equitable and just.


Dated:  February 9, 2022

                                        Respectfully submitted,
                                        SPRINGER AYENI,
                                        A PROFESSIONAL LAW CORPORATION

                                        /s/*Jeena Jiampetti*
                                        Jeena Jiampetti